Then we will call the case of H Ware v. Hospital of the University of Pennsylvania et al. Counsel. Is it Freiwald? Freiwald. Freiwald. Good afternoon, Mr. Freiwald. Thank you very much, Your Honor. And also good afternoon, Judge Ambrose and Judge Cowan. I'm looking at your chairs at bench, but I know we hear your voices very well. Thank you for coming. My name is Aaron Freiwald. I just want to confirm, Judge Cowan, can you hear us, sir? I can hear you fine. I'm on. No problem. Terrific. Thank you again. My name is Aaron Freiwald, and I represent the appellant in this appeal, the estate of Jeffrey Ware by his wife individually. She's also the administratrix of this estate. And as I indicated before the argument, I request respectfully three minutes for a rebuttal. Thank you, Your Honor. I want to ask you a question, Counsel, before you get started. Looking at the exclusively the terms of Price-Waterhouse, could you explain to us how exactly you believe this language as adopting your basic nuclear energy weapons industry approach? Price-Anderson. Price-Anderson, yes. I'm sorry, your question again, Your Honor? Looking at the exclusive language of Price-Anderson, how do you adopt your basic approach as it only applies to nuclear energy and weapons industry approach? Well, that is the heart of our argument, Judge, and I'll take a few minutes if permitted to go through this. The University of Pennsylvania parties in this case argue that the crucial determining factor here, whether Price-Anderson should apply, is whether certain materials are at issue. Our position is that it's the context of the use of the materials that governs. This case should not be in federal court. It should never have been in federal court. Which best case supports that proposition? All of the cases, Your Honor. The University of Pennsylvania defendants, the appellees in this case, don't offer a single case. Not one case authority for the proposition they're advancing here that a Price-Anderson preemption, removal to federal court, should govern in situations outside of either the nuclear power or the nuclear weapons-making industries or those activities that go to support those industries. There is no- What about the Carig case? Carig does. Your Honor- They rely on the ordinary meaning of occurrence to find the term nuclear. And what happened to your event of causing bodily injury arising from radioactive properties of a byproduct material? Carig versus Kerr-McGee case was an Illinois District Court case from 1999 and involved radioactive waste from a nuclear weapons facility. That's not what we have in this case. That would be a case, I would argue, that falls within the context of the use of the materials. These are every single case that we cite to where Price-Anderson was not found, or every case that the appellees cite where Price-Anderson was found, all involve, in one way or another, the nuclear power or nuclear weapons industry. This case involves a university research setting, not even a university where they operated a nuclear reactor for test purposes. Is it closer to Inouye, Cincinnati? Well, it is closer in that Inouye, Cincinnati was a case where they were alleging medical malpractice and other related state law claims from exposure to radiation. And the defendant sought to make it a Price-Anderson case and bring it into federal court, just as the University of Pennsylvania did here. And the court properly found that that was not a case for Price-Anderson. And again, the focus needs to be on the context. And we know this because if you go back to the very reason that Price-Anderson was created, it's really essential to understand that and focus on that. Price-Anderson was a statute designed to encourage industry in the private sector to invest in the nuclear power and the nuclear weapons-making industries. In order to induce them to participate in an industry that, for obvious reasons, has great risks associated with it, they had to create what the Acuna Court calls an indemnification and limitation of liability scheme to protect those industries and encourage them to participate in those industries. There's no basis for saying that the Price-Anderson Act was intended to cover all exposures to radiation, no matter where those exposures may take place. Was there indemnification? Yes. No. Well, how do you read it, Price-Anderson? Why do we have to limit it to the broad language set forth in the Act? Well, we have to limit it to the language in the Act because that's what the statute says. And the court can't, on its own, interpret the clear language of the statute in a broad way beyond the intention of Congress writing the Act. Did we look to the purpose? No, we didn't. The county court did. Well, respectfully, I disagree. That was a case, once again, where we look at the context of the use of those materials and it directly relates to the nuclear power or the nuclear weapons industry. The case here has nothing to do. If we're going to define Price-Anderson as anything involving cesium, which was the material generating radiation in the research Dr. Ware was involved in at the University of Pennsylvania. And this is the appellee's argument. If anywhere and anytime the use of cesium triggers Price-Anderson, then any use of radioactive materials would. And that would mean all activities, whether in research, in education, in science, in industry, would find those disputes in federal court. Isn't that what the Gassi court did in Louisiana? It's the case where the watches were leaking radiation. Exactly. They extended the Price-Anderson to cover those situations, correct? Well, I think that the analogy here is more appropriately looked at in the cases where manufacturing of some kind involved radiation. And those were deemed to be outside the scope. But do you see that case as an outlier? I see that as an outlier. There are one or two outlier decisions from way outside the Third Circuit. And I know those are the cases that are pointed to. But if we extend those outlying cases against the tide of all the other jurisprudence in this area, we're going to find the federal courts inundated with radiation exposure cases simply because they involve some material that may once upon a time have been affiliated with a nuclear power plant. That's not what Congress wrote in the statute. In fact, they rejected attempts to amend Price-Anderson to expand the scope to include, for instance, use in medicine and hospitals and use in universities. That effort in 1988 was rejected by Congress. And it should be rejected here. We need look no further than the defendants can find not a single authority, not one, to support what they're asking this court to do. And the implication of the Third Circuit adopting this argument, again, would not only be to have this case brought in federal court and have it be disposed of in the crazy, twisty, turny way that it was in this case. But it will be to preempt all state law claims, all state law disputes involving any type of radiation exposure. And there can be no way to see Congress's having intended to do that in the Price-Anderson Act. But so hypothetically, the argument will be pretty good pre-1988. But the statute has been expanded dramatically since then. It covers public liability actions arising from nuclear incidents. Nuclear incidents, among other things, can cause sickness or death as a result arising out of resulting from a byproduct material. And there's no dispute that cesium-137 is a byproduct material. So you then say, okay, it doesn't really necessarily apply to this particular educational facility, University of Pennsylvania. But how do you explain Section 2210-K? It's applicable to non-profit educational institutions conducting educational activities. Judge Amber, very simply, there are certain education institutions, and they're listed in the statute and other resources, that actually operate a test nuclear reactor. I think Penn State, for example, is one such institution. University of Pennsylvania is not such an institution. This was research of irradiating animals to understand better the hypothetical effects of radiation on men and women in deep space. This had nothing to do with producing nuclear power or with producing nuclear weapons. So in those research contexts where a university may trigger a nuclear incident, meaning a meltdown or a widespread release of nuclear radiation, then those facilities would be treated no differently, though they be non-profit, from a private sector nuclear power plant like Three Mile Island. But in 1988, Judge Ambrose, Congress did have the opportunity to consider whether to expand the scope of Price-Anderson to universities, and they rejected that. So I think the question Your Honor is raising is, what is a nuclear incident? What is the significance of a material that may trigger Price-Anderson? And again, I think the Court faces a clear choice here. Do we look at the simple fact of a particular class of material being used? Or must we, as Congress intended, look at the context in which that material was used? Is there a distinction to be made between an intentional release of nuclear material and an accidental release of nuclear material? I don't think so. I don't think state of mind or intention is relevant here. I think what's relevant here is that when Price-Anderson is invoked and is found, and when a case like this coming from state court to federal court occurs under Price-Anderson, in effect, state law claims that otherwise would be viable in state court are preempted by the statute. And in effect, that eliminates the right to recover, or certainly the right to pursue a reasonable claim, which would be prosecuted in state court under a very different standard, under a very different dose threshold, under a very different set of considerations. Price-Anderson was enacted to cover public liability actions, major and significant releases of radiation that can occur through nuclear power plants and from nuclear weapons plants, not universities conducting research. That's what I was saying. It's an occurrence. You're in a situation, it was an occurrence, which happened causing bodily injury arising from radioactive properties or product material. Judge, I'm so sorry. It's hard to know. By that reasoning, your honor, every time somebody gets a dental x-ray or a chest x-ray, which involves radiation, theoretically, that could be seen as an incident. But the term nuclear incident and occurrence and radioactive material, as the statute uses them and defines them, and as the courts across the districts and circuits of this country have applied those definitions, limit them to nuclear occurrences in the context of nuclear power or nuclear weapons making, not in the context of university research. If it would, we've had universities doing research with radiation for over half a century. There isn't a single case that the University of Pennsylvania offers, because there is none, because no court has ever done what the lower court in this case has done, which is expand the scope of Price-Anderson as broadly as it has. Let's assume hypothetically we do adopt Price-Anderson. If there's no case... I'm sorry. I'm sorry to cut you off. Go ahead, Judge Ambrose. Go ahead.  If there's no case, then you'd need to look at the statute. And it looks in the statute that you have 2210K provisions, which are applicable to non-profit educational institutions conducting educational activities, and clearly this is research and not the patient care. So while 2210K exempts non-profit educational institutions from certain public liability under the Price-Anderson Act, but why have an exemption if the Act doesn't apply to research universities at all? It has to apply to research universities in some context. It does, Your Honor, and I believe that that context is those universities, again, that have a license to operate a test nuclear power facility, not to do any kind of the wide-ranging sorts of research that universities engage in all the time involving radioactive materials that hospitals across the country engage in when they use radioactive materials. And when I said that there is no case, that the appellees have no case, I don't mean that there are no cases that are relevant here. All of the cases that we cite, and frankly, all of the cases that appellees cite as well, again, with the exception of one outlier, two outliers, specifically say that it's exactly what I'm saying. For example, in the samples case, which involved uranium mining but not mining that had anything to do directly with the nuclear power industry, the judge in that case, the court in that case rejected applying Price-Anderson, in fact, called it hogwash to suggest that Price-Anderson should be, should have a scope as expansive as the defendants in that case were requesting as the appellees in this case are trying to enforce. So it isn't that there's no authority. It's that there's no authority for the novel, unprecedented proposition that the first time that a court, that a circuit court would be endorsing a federal preemption of each and every, of a multitude of application of radioactive materials that have nothing to do at all with either nuclear power or nuclear weapons making. Those are the only two industries that Congress sought to protect by setting the threshold dose limits that they set and by setting the other requirements that were part of the statute. They never intended this and that's why it's never been, that's why no court has ever found itself. Counsel, several courts have rejected the Gilbert indemnification requirement, agreement requirement, which would apply to, which would not apply in this case. I don't know, I don't, Your Honor, respectfully, I don't know what the several decisions are. There's one that Judge Restrepo mentioned from far away from the Third Circuit. There's a case called DuMontier as well, which also involves cesium, which the University of Pennsylvania, which the appellees rely on, which was a Ninth Circuit case from 15 years ago. But in that case, in DuMontier, the issue was what is the bottling injury? From what we have of the record in that case, it doesn't even give us any sense of what happened in terms of the Price-Anderson argument. So for a variety of reasons, I don't think this court ought to rely on DuMontier. Rather, I think the court ought to rely on all the other precedents, all the other courts that have stated clearly that this act is intended to be, is intended to apply to those two industries alone and to the plain language of the statute and to the attention of Congress which was fairly well stated in the 1950s and at the times when there were efforts to amend the statute. So I don't see any authority, any authority that this court ought to rely on for the expansion of the scope of this act to create a preemption of all state claims in New Jersey, Pennsylvania and the other parts of this district of the circuit. It doesn't, there's no authority for that. So hypothetically, do we do adopt it? Hypothetically speaking, what do we do about causation and the fact that there's no response to the summary judgment papers? Well, now we're getting, to answer that, Your Honor, and I will, we're getting into the weeds of how this case spun out. What are the weeds? There was no response to summary judgment, correct? There could be no response to summary judgment in this case because we have an, we had an expert. There was a finding that Dr. Ware, through the activities which were unmonitored and all the other facts that are alleged in the case, that there was an exposure to radiation during these experiments that he was doing. I think there's a dispute that there was exposure. It's whether the exposure caused the death of the plate. Right. Under Price-Anderson, we don't even get to causation unless we get above a very high level of dose. And under state law, which is where this case and every other case are conceding that if it stays in federal court, you can't make the case out? That is exactly right. We have an expert who established a certain dose based on the discovery that was done. Under state law, the standard is, is that dose a factual cause? Is it a significant contributing factor to his brain cancer? We can make out that case. So you are conceding that if the Price-Anderson applies, you'd lose? There's no question. That's what's going to happen, by the way, in almost every case of this kind because you don't have the kind of massive releases of radiation unless you have the type of nuclear incident that Price-Anderson was intended to protect against. That doesn't mean that those claims aren't meritorious. It doesn't mean that those claims can't be viable and reasonably pursued under state law. They should be. That's where they should be litigated is in state courts where the courts are capable of and frequently deal with all kinds of exposure cases, whether it's asbestos or chemical exposure or radiation exposure. There's no reason to federalize and thereby preempt all state law on this massive group of cases. Let me ask this question, Dan. If you say that if Price-Anderson applies, you can't win, when the case was removed to the federal district court, I thought you responded ultimately by dismissing all claims against the National Space Medical Research Institute and amending the complaint to include two counts of negligence under the Price-Anderson Act. We were required to do that as a result of the court's decision finding that Price-Anderson applied. We had to amend the complaint to conform with the court's ruling. That doesn't mean we were conceding that we agreed that Price-Anderson should apply. We vigorously opposed applying Price-Anderson in this case. Once the court had so ruled, we hadn't yet begun any discovery. Frankly, it was our position that we were obligated ethically to conduct discovery to see what we would be able to determine. In fact, defendants, I think as pointed out in their briefs, produced thousands of pages of documents, including thousands of pages of record and hours and hours of videotaped documents only a few weeks before the close of discovery. We were trying to get access to whatever discovery we could get in hopes that we could establish a dose at this extremely high level, but we were fairly confident that we wouldn't be able to because Price-Anderson sets a very high dose level. So at that point, we said, well, we're not going to be able to do this. We have a state law claim that's viable. That's where the case really always belonged. But if this court's going to apply Price-Anderson, we're going to lose and let's at least have the other state law claims, which were really informed consent claims relating to the subsequent medical treatment Dr. Ware received. Let's at least have those severed and have those sent back to state court, and we'll take an appeal on the Price-Anderson decision. The court then went on to dismiss all the claims in summary judgment, and that is what has allowed us to come today to seek to reverse. The entire case takes on a different complexion if Price-Anderson doesn't control in this case, and that different complexion is the one we started with when we founded the case. I believe, again, respectfully, that's the complexion it needs to have. Otherwise, once again, we're going to have every radiation exposure-related dispute become a federal court action, and there's no reason to believe that that's what should happen. Congress didn't intend it. No decision of a district court or a circuit court has said that's what should happen, and by looking at the language and rationale of every court that has faced these issues, it's clear that that's not what should happen here. Thank you. Thank you, Your Honor. Judge Cohen, Judge Ambrose, any other questions? What did Congress expand in 1988 with respect to the jurisdiction of the Price-Anderson Act? In other words, 1988 amendments did something, and it's perceived that they expanded the number of matters that would be covered under the Act that otherwise would not have been covered. Prior to maybe 88, the Three Mile Island type of thing would be covered, but in 88, it was expanded. What did that expansion cover? Your Honor, I'm not an expert in the 1988 amendments, I'll confess, and my counsel for the University of Pennsylvania may well know the answer to that. What I do know is that very specifically, Congress considered expanding into some areas and rejected and decided against expanding into those areas, and the areas that Congress did not go into in expanding the scope of Price-Anderson are those areas that are most relevant here. I think Your Honor is correct. The amendments in 1988 followed the Three Mile Island nuclear accident. There were some areas that were expanded, but they weren't expanded beyond nuclear power and nuclear weapons making, to the best of my knowledge, Your Honor. All right. Thank you. Thank you. Afternoon. I'm Mr. Josie, representing the appellee, and we want to change our time designation just briefly, nine minutes for me instead of ten, and six minutes for my co-counsel. That's fine. Ms. Sachs instead of five. As the Court is quite aware, this all boils down to a question of statutory interpretation. What's the intent of Congress as reflected in the statute? Congress knows how to create limitations in Price-Anderson coverage when it wants to do so. Let me prove that to you. The definitions of the words used in the Price-Anderson Act are contained in 42 U.S.C. Section 2014, and if you look to subsection W, that's where Congress defines public liability, and this was, in essence, one of the big changes in 1988. Public liability is any legal liability from a nuclear incident, but notice what happens next. Congress then lists three exceptions to public liability, to any liability, and one exception is workers' comp, so workers' comp claim is not brought into Price-Anderson. In subsection Q, Congress defines nuclear incident as any occurrence in the U.S. causing physical injury or property damage due to the radiological properties of source, special nuclear, or byproduct material, and that's what we have here, byproduct material, an allegation of harm from byproduct material. Now notice, in subsection Q, Congress does not create any limitation as it did in subsection W. In fact, page three of Appellant's reply brief is asking this court to read language into subsection Q. They want you to read subsection Q as if it said, byproduct material only at federally regulated power plants, other nuclear energy producers, and the weapons industry. Congress did not include that exception, that language, and it knows how to do so as just proven in subsection W when it limited or created exclusions. What about the fact that- Counsel, what is your response to the plaintiff's argument that ruling in your favor would effectively grant immunity to your clients? I think Congress clearly did not intend. Not at all. Congress intended Price-Anderson to cover any allegation of harm from the radiological properties of byproduct material, period. No exceptions. And it's not some sort of protection that's absolute. You apply the federal permissible dose limits as the standard of care. There's a complete federal preemption of nuclear safety. That's effectuated through the NRC setting permissible dose limits, telling licensees using these materials for research or whatever purpose that you can use this material for the beneficial use of mankind, but you must keep the doses within these limits. These are permitted to workers and these doses, other doses would be permitted to members of the general public. That is the duty owed in Price-Anderson. And so there is liability under Price-Anderson in federal court if there is injury. And those dose limits have been exceeded. So you don't see the Louisiana case as an outlier, the wristwatch case? No. But I would just say you have to be careful when you talk about radiation cases. Because you see, you have to focus on that language. It's source, special nuclear or byproduct material. Did the radiation come from source, special nuclear or byproduct material? You can have radiation from radium dials in wristwatches. Radium is not source, special nuclear or byproduct material. What about the x-ray analogy you're counting? X-rays are not source, special nuclear or byproduct materials. X-rays are radiation generated by a machine. It has nothing to do, Price-Anderson has nothing to do with dental x-rays or cat scans or medical x-rays. It's source, special nuclear or byproduct material. It's the material. It's not the place where the material is utilized. In fact, Congress wanted these materials to be discovered, researched, and the beneficial uses of them exploited for the benefit of mankind. Are you aware of the circuit decisions that applied Price-Anderson that had no connections to the nuclear power? Of course. Which cases? Dumont-Terre. I handled the Dumont-Terre case. It was in Montana. The District Court and the Court of Appeals applied Price-Anderson. What happened in Dumont-Terre is the byproduct material was used to log oil wells. This is a device you put down into an oil well and it sends radiation out, bounces back from the rocks, and that's how you can tell the formations. You know, and let's say you're looking for, you're doing fracking, you're looking for a certain formation when you're going to turn your drill rig and go laterally. Well, that is not a nuclear power plant. It's a beneficial use of byproduct materials. And the court applied Price-Anderson. It just focused in its final opinion on a different section of Price-Anderson, which is bodily injury. Because you see, the court never specifically addressed the meaning of the term occurrence. It was not an issue in that sense. Well, it is in this case. It really isn't in this case. I know that that was the argument in Gillibird, but Gillibird was all wrong, totally misunderstood the Price-Anderson Act. Gillibird took language from an ENO, which is an Extraordinary Nuclear Occurrence, and the language is referring to on-site or off-site. And Gillibird took that language and tried to apply it to a nuclear incident, which doesn't involve on-site or off-site. Nuclear incidents can occur on-site. They can occur off-site. An ENO can only occur off-site. What about the indemnification or lack thereof in this case? What do we do with that? It doesn't really matter. Indemnification, it was just an effort by Congress and the NRC to encourage certain large utilities who wanted to build a nuclear power plant but were concerned about liability and wanted some indemnification. And it also particularly existed in DOE contracts. But small uses of radiation, small uses of by-product material do not need indemnification because the risk is very small. And so indemnification doesn't exist in every Price-Anderson case. Does the university have an indemnification agreement with either the federal government or the Commonwealth of Pennsylvania? Not for this use of by-product material. And it's not needed. The indemnification and the discussion that you pointed to about universities is a discussion of whether or not the university must provide the full amount of financial protection under Price-Anderson. Think of it as a large insurance policy. And when you have small amounts of radioactive materials creating small risks, you can rely on conventional insurance. You don't need the massive amounts of financial protection. So the NRC doesn't have to require it. If I may, if I could go back to the question I asked of your opposing counsel. How far does the Price-Anderson Act jurisdictional grant extend? It extends just as far as the language in the Act. It extends... What is not covered? What is not covered by Price-Anderson? Yeah, let me expand on that. Does it reach harm from radiation entirely disconnected from the nuclear industry? Because your opponent is saying it has to be connected in some way with the nuclear industry. This doesn't. This isn't that situation. Therefore, it's not covered. The only connection is special nuclear source or by-product material. El Paso natural gas was source material. This case and Dumont-Terre is by-product material. But things like medical x-rays, things like radiation from naturally occurring uranium or naturally occurring radium, dental x-rays, medical treatment using CAT scans, that's all not covered. I'm not sure if this question is for you or Ms. Sachs, let's assume that we find that the Price-Anderson does not cover the conduct in question, then we would never have had jurisdiction appropriately, correct? That's correct. So then we would have to remand to the state court. I think if we don't have jurisdiction... Yeah, I think we probably remand to the district court with instructions to remand. Send back to the state court. Yes, yes. Well, even if we don't have that finding, don't you agree that the district court put Plaintiff in an impossible position by suggesting she should have withdrawn the Price-Anderson claim at an earlier date, even though counsel obviously could not... It would obviously need time to review the discovery produced at the last minute of these claims. I don't want to take the part of my co-counsel's argument or issues, but I don't want to duck your question, so just let me say, if the Plaintiff here in the district court was concerned and they only wanted to do partial discovery, they wanted to deal with issues in a seriatim fashion, they should have asked the district court for an order failing discovery. In fact, the district court's discovery order ordered all discovery on all issues with a date set for summary judgment motions, and we conducted extensive discovery. Okay? Thank you. Thank you, sir. Is it Ms. Sachs? Good afternoon, Judge Restapo, Judge Ambrose, and Judge Cowan. I will pick up with the question that the panel was just asking, because my role here is to address the second issue that plaintiffs have raised on the appeal, and that is whether or not the district court abused its discretion in not doing what plaintiffs requested, which was beyond the 11th hour of this litigation. After two years in the district court and 40 days after the plaintiff's expert deadline had passed with no expert reports whatsoever being produced, plaintiffs sent a letter to the court saying, we're going to discontinue those claims and you should just send everything else back to the state court, which, of course, under Rule 41A2 is not an entitlement, as plaintiffs, I think, have continued to assume in this court. That's a matter of the discretion of the district court, and this court identified back in the Ferguson case in 1974 what the court should look at in assessing whether or not a claim to or a request to voluntarily discontinue without prejudice should be granted. And courts have sort of developed five factors, but they really boil down to pretty much two. Where does this litigation stand? And has plaintiff been diligent in asking to discontinue? And the factors, no matter how you break them down, all weigh heavily against the plaintiff in this case. And to answer the question that I think Your Honor, Judge Cowan asked, how could plaintiff figure all this out once Judge Smith adopted Magistrate Judge Angell's report, I guess there are a couple of points I need to make. Number one, this case was removed to federal court on January 2nd of 2014. So it was more than 23 months before plaintiff decided that they were going to voluntarily withdraw without prejudice the Price-Anderson claims. In the meantime, there had been not only the notice of removal based on Price-Anderson, so it was clear right from the start that the allegations were that this applied. There was a 12B6 motion again in January of 2014 setting forth all of the details that a plaintiff would have to meet to make out a Price-Anderson claim. Magistrate Judge Angell decided and issued her report and recommendation in May of 2014 saying that Price-Anderson applied and Judge Smith adopted that in December. When was discovery complete? When did the defense turn over the last set of documents? Well, interestingly, those documents are mentioned, Your Honor, because it requires some more explanation. What counsel has referred to in his brief, and I think, again, an argument to this court about all of this stuff being dumped on him at the last minute, those documents, actually they were CDs, were 150 CDs of ferrets being irradiated in Loma Linda, California, a place where Dr. Ware never was. It had nothing to do with anything, but the plaintiffs wanted this. We had learned of their existence. My colleague, Mr. Josie, went and I think dug them up, but we made the plaintiff aware of them. The plaintiffs wanted to have those. They wanted an opportunity to review them, and they did. It had nothing to do with whether or not the requirements of Price-Anderson should have been evaluated by plaintiff long before we spent. Even in that last year, to Judge Cowan's point, there are 47 docket entries between the time that Judge Smith adopted Magistrate Judge Angell's ruling that Price-Anderson applied and the time that the dispositive motions were granted. There were discovery motions, there were scheduling orders, there were conferences with the court. At no time did the plaintiff ever say, we need more time, we don't understand this material, our expert hadn't been able to evaluate it, nothing like that. To expand on that, just specific to the medical malpractice claim, because that has been raised here as well, whether that should have been sent back to the state court, plaintiff's counsel has said on this appeal that it wasn't fair, basically, to him to enter summary judgment because he didn't really pay attention to that medical malpractice claim and there was only limited discovery directed to Price-Anderson. And that is absolutely not true. And the records are very clear. There were five scheduling orders in this case. The second one was when the case was transferred to Judge Leeson and he re-adopted the original one from Judge Smith. We can call it four. There was never any limitation on discovery. All of the claims were part of this case right from the start. We answered written interrogatories, we produced all the documents. The doctor who had been sued for medical malpractice was produced for deposition. We deposed the witnesses who allegedly had some knowledge on this medical malpractice claim and we produced experts. We produced five experts on all of these very complex and interrelated areas including radiologic epidemiology and health physics and how to treat a gliosarcoma. But we produced extensive expert reports supported by extensive scientific research. So it sounds like you're waiting to defend the case tomorrow. So where's the prejudice if it did go back? Your Honor, one of the factors that this court identified both in Ferguson and more recently in the Hayden case which was 2014. I think the words this court used were the fact that some of the documents from the federal court might be able to be recycled in the state court and that was the word that the court used is little consolation to a litigant who has now spent all of that time preparing this case for trial. And again this is a case where the expert deadline for the plaintiffs came and went with no expert on any theory. Nothing on medical malpractice, nothing on informed consent, nothing on the Price-Anderson issues. I think they conceded that if it stayed in federal court they'd lose. I'm sorry? They just conceded that if it stayed in federal court they were going to lose. They conceded that the Price-Anderson standard they could not meet. But to back up I think to one of the arguments the plaintiff made on this appeal and I think one of the judges touched on earlier, plaintiff wanted to voluntarily discontinue the claims the plaintiff identified as Price-Anderson without prejudice. Now frankly, as Judge Leeson pointed out, these are very interrelated claims. Not only in plaintiff's complaint, each count of which incorporates those Price-Anderson allegations, but also very specifically I think on page 53 of our brief we identify the paragraphs of plaintiff's complaint where they incorporate things that could only be Price-Anderson allegations. And those are in those other... Yeah, but what about the non-Price-Anderson allegations? What about fraud? What about negligence? Those are typically state law claims. In fact, this was initially filed in the state, in the commonwealth. So how are those so inextricably intertwined that somehow you have to consider them only with regard to Price-Anderson? That doesn't make sense. Well, it does, Your Honor. I think if you go back and look at what plaintiffs actually alleged, which is that they said we had an obligation to advise Dr. Ware about this allegedly excessive radiation. Well, it wasn't excessive radiation or that certain components were not being met when in fact they were. But let me get even more basic. Plaintiff themselves, plaintiff herself, incorporated these allegations into those claims, into the fraud claim, into the negligent infliction of emotional distress claim. All of those claims incorporated not only generally the Price-Anderson allegations, but also specific allegations regarding radiation safety that take us right back to Price-Anderson. And they did that even... I'm sorry, I apologize, Your Honor. No problem. I'm just looking at this from 10,000 feet. There is not enough exposure to radiation that brings into play the Price-Anderson Act. There may be, however, things that were done that perhaps were negligent, perhaps if you believe that the complaint were fraudulent. What you're in effect saying is if they come under the amount that would bring into play the Price-Anderson Act in terms of liability, they're nonetheless under the Price-Anderson Act and the court under 1367 and the act itself can deal with all these other particular actions that in effect takes the plaintiff out of any action whatsoever. No, Your Honor, and if I said that, I'll let me back up and clarify it. In this particular case, the allegations were not separated. And in fact, when plaintiff was in possession of the district court's ruling that Price-Anderson would apply, plaintiff amended the complaint and did not remove from any of those counts the Price-Anderson allegations. Plaintiff didn't separate them out. So I have to say starting from the point that plaintiff did not even attempt to make that distinction. However, assuming that distinction could be made, Your Honor, they had a chance to do that and they didn't bother here. They could have done what we did, which is we had an expert from Johns Hopkins review all of these medical records and say that Dr. Ware received the optimal care, the optimal standard of care for this very unfortunate condition. There was no medical malpractice. Plaintiffs did not ever do any of that. What plaintiffs appear to have done was to assume that they were absolutely entitled to just drop those Price-Anderson claims and just take the rest of their case back to federal court. I mean, back to state court after two years of litigation. They never opposed summary judgment on any basis. They never produced a single expert report. What claim brought in state court in this case, given these facts? I'm sorry? What claim, hypothetically, what claim could be brought in state court given these facts that would not be subject to removal under Price-Anderson? I will tell you, if plaintiff had filed only a medical malpractice claim, let's say, because her medical malpractice claim was separate in theory from the allegations of what came before, the medical malpractice claim was that once Dr. Ware was diagnosed, he should have been given different treatment. He should not have been... Would you argue that this was caused in theory by the same source and therefore it's covered by Price-Anderson? Their only allegation was not the cause of the cancer, but his medical malpractice, alleged medical malpractice, after the diagnosis. I think that one could separate those out and say, regardless of where the cancer came from, the cancer could come from any source. As we say, this is one of those unfortunate certain number of cases that occurs naturally in Pennsylvania and everywhere. But if the cause of that cancer were taken out of the equation  once Dr. Ware had this diagnosis of cancer, you defendants, the individual doctor who was sued and the other 10 entities, you should have given him different treatment for his cancer. He should have gotten X, Y, and Z treatment instead of the treatment that he got. That claim, which doesn't matter where the cancer comes from, would be a separate type of claim that would not be subject to Price-Anderson with those limitations. Now, I'm not sure plaintiff ever pleaded that, but certainly plaintiff never defended that and never produced expert reports to defend that. And having waited until they did, this is the precise kind of substantial prejudice to a defendant that this court cautioned against in the Ferguson case. You can't wait around and try out some causes of action in federal court and put defendant parties through the entire gamut of litigation and then on the 11th and a half hour before trial, say, I want to go back to state court and try again. And this court has recognized that in several cases. And this is a matter for the district court's discretion. In Ferguson, this court said the district court had abused its discretion in granting a discontinuance. And the circumstances of this case are far more prejudicial to the defendant. Than the ones in Ferguson, that this court said the district court never should have allowed a discontinuance. So here, Judge Leeson was well within his discretion. His decision to grant summary judgment was correct as a matter of law. And we urge the court to affirm for the reasons set forth in Judge Leeson's opinion and in the prior opinions of Magistrate Judge Angel and Judge Smith. Judge Chamberlain, Judge Cohen, any other questions? No, nothing further to make, thank you. Thank you. Thank you. Your Honor, good afternoon again, Aaron Freewold. I only have a few minutes for my rebuttal. And I therefore don't have enough time to go through what I will respectfully just note for the record were numerous inaccurate statements about what happened during the conduct and discovery of this case. For example, Dr. Ware was at Loma Linda where those animal videos were recorded. He participated in research that was done at some of the remote locations, not only within the walls of the University of Pennsylvania. Or the fact that this request to the court, which was a request to voluntarily dismiss the Price-Anderson claim so that the separately pleaded medical malpractice claims could be remanded to state court, was taken not 23 months late, but 14 days or so after the close of discovery. There's really no way for counsel to say once Price-Anderson was found to apply, we give up. We had to conduct discovery. And in fact, one of the things that was learned and confirmed during discovery relevant to the issue of dose, the amount of radiation, because that is the factor on which liability turns in this type of a case, the amount of radiation exposure there was. And as it turns out,  is that workers like Dr. Ware and the research laboratory at the University of Pennsylvania, though exposed to radiation, didn't receive individual monitoring badges like every other worker who works in and around radiation is supposed to have. So on the issue of was there a negligence, it was clear negligence in not even bothering to monitor Dr. Ware, the other researchers, and the environment in which the radiation exposure was taking place. So of course we start, plaintiff starts, with a very uphill battle in determining dose. But the ultimate death blow comes by the request being accepted to have Price-Anderson applied. Because now we're dealing with a level of dose that was intended by Congress, as all the courts have found, to be a liability-limiting threshold. A liability-limiting threshold so that contractors like Exelon, companies like Exelon and General Electric will want to come in and provide nuclear power to this country. To set a very high dose level so that only those major exposure cases, that's what a nuclear occurrence is in this context, only major exposure incidences will be those that the federal statute will allow recovery for, will even allow a claim to proceed on. State court handles the full spectrum of claims available under state law and that's what this type of claim really should have been governed by, is the state law. One final point, your honors, is that I've mentioned that, as we say, the floodgates will open to federal court if this theory of the scope of Price-Anderson is allowed to prevail. That any type of radioactive materials, by-product materials, regardless of context, gives basis for Price-Anderson preemption. But Mr. Jose talks about the beneficial uses that Congress intended to encourage research into the beneficial uses of these by-product materials. The opposite effect is what's going to happen because if Price-Anderson is allowed to govern over, let's say, university research involving by-product materials like cesium or industry applications of by-product materials or other kinds of research in academia, in industry, in all walks of life, then there will be a strong and powerful disincentive to those who have control over those materials to protect not only workers like Dr. Ware but to protect the public because they will be treated just like General Electric and Exelon are treated, like Three Mile Island would now be treated under this statute, as only facing liability in those major nuclear occurrences, not in the types of radiation exposures or chemical exposures or dangerous product exposures that find resolution in state court but only those that rise to the Price-Anderson level of exposure, which is a major nuclear occurrence. There'll be a powerful disincentive because those cases like this one will come into federal court and plaintiffs like my client will face not just an uphill battle, which we often face where a party, for instance, doesn't keep records or doesn't do the things that they ought to do so that we have a body of evidence regarding exposure, but now we have a mountain to climb in terms of proving a level of exposure that's only intended by the clear language of the statute to apply in nuclear occurrences. So for those reasons, this novel out-of-the-box, unsupported, without authority proposition that all applications of these materials, regardless of context, must be federalized and plaintiffs must have those claims in effect preempted. And to Your Honor's earlier point, to provide all of those users of these materials, in effect, a form of indemnification, that should not be permitted and the lower court's ruling should be reversed. Thank you very much. Thank you, Judge Amber. Judge Cohn. Thank you. Thank you, sir. One quick question, Judge Estrepo. Do you want to clear the courtroom and we'll just stay on the line?